**Pravin THAKKAR, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 48A05–9111–CR–386.**

Court of Appeals of Indiana,
Fifth District.

May 17, 1993.

---

⚷9

Jeffrey A. Lockwood, Schuyler, Eisele & Lockwood, Anderson, James H. Voyles,

Dennis E. Zahn, Indianapolis, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Lisa M. Paunicka, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

BARTEAU, Judge.

Pravin Thakkar appeals his convictions of:

> two (2) counts of performing an illegal abortion;
>
> two (2) counts of battery;
>
> two (2) counts of criminal recklessness; and
>
> one (1) count of attempted illegal abortion.

The criminal recklessness convictions were merged with the battery convictions. Thakkar received concurrent eight-year sentences, with four years executed and four years suspended, on all counts except one count of performing an illegal abortion as to Connie Hertzinger. For this conviction, Thakkar received an eight-year executed sentence, to run consecutive to the other sentences.

Thakkar raises the following issues:

1. Whether the trial judge erred in denying Thakkar's motion to dismiss Count VIII (illegal abortion as to Hertzinger), because the statute of limitations had run on the alleged offense;

2. Whether the conduct and demeanor of the trial judge during voir dire denied Thakkar a fair trial before an impartial jury;

3. Whether the conduct and demeanor of the trial judge, along with erroneous rulings in favor of the State, denied Thakkar a fair trial before an impartial jury; and

4. Whether the trial judge erred in enhancing Thakkar's sentence for the Hertzinger conviction by using as aggravating circumstances a material element of the offense and lack of remorse.

We also address *sua sponte* whether the trial judge erred in enhancing Thakkar's sentences for the other convictions without stating any aggravating factors.

We affirm in part, reverse in part, and remand for either re-sentencing or a statement of aggravating factors.

## FACTS

The charges against Thakkar resulted from separate activities involving three victims. We will state the facts supporting the convictions as they pertain to each victim separately.

### Carmen "Connie" Hertzinger

Carmen "Connie" Hertzinger, also known as Carmen "Connie" Singer ("Hertzinger"), first met Dr. Thakkar in October, 1982, when she went to see him at his office for treatment of a sore throat. Thakkar called Hertzinger the next day to see how the medication was working and the two agreed to meet for coffee a few days later. The two began seeing each other on a regular basis and in February, 1983, Hertzinger became pregnant with Thakkar's child. Thakkar suggested that Hertzinger have an abortion but Hertzinger refused. On October 28, 1983, Thakkar took Hertzinger to his house, telling her that he wanted to check on the progress of the baby. He told her that he could not find a heartbeat and that the baby was dead. Thakkar then gave Hertzinger some pills to calm her down and took her upstairs. Hertzinger fell asleep. She awoke at some point and heard a baby cry and then she fell asleep again. When she awoke again she asked to see the baby and Thakkar told her the baby had been stillborn.

Thakkar took Hertzinger home the next day and when Hertzinger continued to ask about the baby, Thakkar threatened her that if she did not keep quiet about the baby he would kill her and her family. Thakkar regularly repeated his threats to Hertzinger until sometime in January, 1984, after which she had no contact of any kind with him. In January, 1984, during a counseling session, Hertzinger revealed to a psychiatrist and to her therapist that Thakkar had aborted her pregnancy. Law enforcement officials were not notified of the incident until February 3, 1989.

### Bonnie Coffey-Myers

Bonnie Coffey-Myers and Thakkar met in May, 1987, and a personal relationship developed. Coffey-Myers was concerned about becoming pregnant and agreed to have Thakkar perform a tubal ligation. Thakkar arranged to perform the tubal ligation on July 31, 1987, at Tipton Hospital and instructed Coffey-Myers to go to the hospital on July 25 in order to have blood tests prior to the surgery. Coffey-Myers told Thakkar she thought she was pregnant and Thakkar told her to come to his office after the blood test on July 25 so he could determine if she was pregnant.

When Coffey-Myers saw Thakkar in his office that afternoon, he took a urine sample and told her that she was not pregnant. He then told her that he would start her period. He proceeded to insert an instrument that "looked a lot like a big steel knitting needle" into her vagina. Coffey-Myers felt excruciating pain.

Thakkar told Coffey-Myers several days later that the blood test results from the hospital showed that she was in fact pregnant. Thakkar scheduled an appointment for her at an abortion clinic in Indianapolis, but, when Coffey-Myers arrived the clinic would not perform the abortion because the pregnancy had not reached six weeks. Thakkar performed the abortion during the tubal ligation at Tipton Hospital.

### Kathy Collins

Kathy Collins met Thakkar as a patient in March, 1984. A personal relationship developed and they dated on and off from 1984 through 1987, seeing each other on a regular basis for a few months at a time. In October of 1987 they began seeing each other on a regular basis again. On January 9, 1988, during an examination to see if Collins was pregnant, Thakkar inserted a metal instrument into Collins' vagina and Collins twice felt an excruciating pain. After the examination, Collins began bleeding heavily and went to the hospital. She was told she was pregnant and should go home and put her feet up. Collins continued to bleed heavily and Thakkar put her on medication.

In late January, Thakkar admitted Collins to Mercy Hospital to take care of the bleeding. While in the hospital, Collins fell after using the bathroom and began to bleed. A nurse reached into the toilet and said, "I think this is it, I think this is the fetus." Thakkar performed a dilation and curettage on Collins and later asked her how she felt after the abortion.

## STATUTE OF LIMITATIONS

■ Thakkar argues that the trial judge should have dismissed Count VIII (Count I of a separate indictment from the other counts, but referred to. throughout trial as Count VIII), the illegal abortion performed on Hertzinger, a class C felony, because the statute of limitations had run.

Indiana Code 35–41–4–2 provides that a prosecution is barred unless it is commenced within five (5) years after the commission of a class C felony. The period within which a prosecution must be commenced does not include any period in which the accused conceals evidence of the offense. I.C. 35–41–4–2(d)(2). The indictment alleged, and the evidence at trial showed, that Thakkar performed an illegal abortion on Hertzinger on October 28, 1983, and that Thakkar threatened Hertzinger with physical harm if she told anyone what had happened. The indictment was returned on November 1, 1989, more than five (5) years after the commission of the offense.

The State, relying on Crider v. State (1988), Ind., 531 N.E.2d 1151, contends that Thakkar's threats to Hertzinger tolled the running of the statute until she revealed the facts of the crime to law enforcement officials on February 3, 1989. Crider involved a nine-year-old victim of child molesting who was threatened by his father, the defendant, not to tell about the molestations. The court concluded that the defendant's positive acts of intimidation tolled the running of the statute of limitations until the victim reported the abuse to authorities.

Thakkar asks us to distinguish Crider on the basis that the victim in that case was

subjected to the ongoing parental authority of the defendant. Here, Hertzinger did not receive any threats from Thakkar, or have any other contact with him, after January of 1984. Thus, Thakkar argues, citing *State v. Bentley* (1986), 239 Kan. 334, 721 P.2d 227, that Hertzinger was not subjected to a continuing coercive influence that should toll the statute until she notified the authorities in February of 1989. In *Bentley*, the Kansas Supreme Court rejected the State's argument that the defendant's threat to his nine-year old niece and victim of abuse should toll the statute of limitations. The Kansas statute of limitations contains a section similar to I.C. 35–41–4–2(d)(2), whereby the period within which prosecution must commence does not include any period in which the fact of the crime is concealed.

■ Thakkar's reliance on *Bentley* is misplaced, however. The Kansas court did not base its holding on a lack of a continuing coercive influence. Instead, the court reasoned that the victim knew the crime had been committed because crimes against persons, by their very nature, cannot be concealed. Thus, the court would not hold that a threat constitutes concealment. *Id.; see also State v. Tidwell* (1989), Tenn.Crim. App., 775 S.W.2d 379. Our own supreme court, however, has rejected this view and does equate threats made to a child victim with concealment of a crime. *Crider*, 531 N.E.2d 1151.

Underlying both the State's and Thakkar's argument is the issue whether the reasoning of *Crider* should be extended to a situation where the victim is an adult. Thakkar argues that if the reasoning is applied to an adult, the statute of limitations can be tolled only during such time threats are actually made. Thus, the statute would begin to run again in January, 1984, when Thakkar stopped threatening Hertzinger. Neither party has brought to our attention, nor has our own research revealed, a case where a threat made to an adult victim was equated with concealment of the crime, thus tolling the statute of limitations.

■ We begin our analysis by noting that any exception to the statute of limitations must be construed narrowly and in a light most favorable to the accused. *State v. Holmes* (1979), 181 Ind.App. 634, 393 N.E.2d 242, 244. In rejecting the position that a crime of molestation against a child cannot be concealed because the child knows about the crime, courts specifically mention the particular vulnerability of child molest victims and the continuing coercive influence the defendant, usually a parent or other family member, has over the child to prevent the child from disclosing the crime. *See, e.g., Walstrom v. State* (1988), 104 Nev. 51, 752 P.2d 225 (vulnerability of children; should not assign to them full adult responsibility for reporting crimes where they are victims); *State v. Danielski* (1984), Minn.App., 348 N.W.2d 352, *review denied* (so long as coercive parental authority over child victim continues, offense is continuing in nature and statute of limitations does not begin to run). In *Crider*, our supreme court did not specifically rely on a "continuing coercive influence" to reach the result that the defendant concealed the crime, but did state that the defendant-father "concealed the fact of his crimes by his positive acts of intimidation of his victims...." 531 N.E.2d at 1154.

Minnesota, while recognizing that the continuing coercive influence of the defendant will prevent the statute of limitations from running, distinguishes the case where a defendant does not have control over the victim's day-to-day movements and does not live with the victim. *State v. Shamp* (1988), Minn.App., 422 N.W.2d 736, *rev'd on other grounds* (defendant threatened victim but did not live with her and did not have coercive influence over her; statute of limitations not tolled); *State v. French* (1986), Minn.App., 392 N.W.2d 596 (as uncle and teacher, defendant was in a position of authority over victim, but did not threaten victim and did not "actively coerce" victim not to report incidents; statute of limitations not tolled).

■ We, too, see a distinction between a situation where the victim is a child under the authoritative day-to-day continuing co-

ercive influence of a defendant and one in which the victim is neither a child nor under the authoritative day-to-day continuing coercive influence of a defendant. We need not decide today, however, whether the holding in *Crider* should be extended to a situation where the victim is an adult. On the facts presented in this case, it is at least arguable that Thakkar, due to the nature of his relationship with Hertzinger, had some coercive influence over Hertzinger immediately following the abortion when he called her frequently and threatened her. Assuming there was some coercive influence rising to the level of concealment of the crime, that influence ceased in January of 1984 because Hertzinger did not have any contact at all with Thakkar after that date. In the absence of the coercive influence, the statute of limitations began to run. *See State v. Davidson* (1991), Tenn., 816 S.W.2d 316 (tolling is not forever; if tolling triggered by concealment, statute begins to run when concealment ends). At the latest, the statute began to run in January of 1984 and charges were not filed until more than five years later on November 1, 1989. Because the State did not bring charges against Thakkar in a timely manner, the trial court erred in not dismissing Count VIII, the charges relating to Hertzinger. Because we reverse the conviction on the above-stated grounds, we need not discuss a second issue posed by Thakkar, that is: whether Hertzinger's disclosure to her psychiatrist and therapist was a disclosure to authorities that would trigger the running of the statute of limitations.

### VOIR DIRE

■ Thakkar next argues that the trial judge's conduct during voir dire deprived him of a fair trial by an impartial jury. Thakkar points to four specific occasions during his counsel's voir dire of prospective jurors where he argues the trial judge abandoned his impartiality and prejudiced Thakkar: (1) the trial judge interrupted counsel when he was distinguishing the civil and criminal standards of proof to the prospective jurors and told counsel to stick to the issues and not confuse the jurors;

(2) the trial judge interrupted counsel when he was describing the requirement of the presumption of innocence and the judge told the jury that Thakkar is presumed to be not guilty; (3) when counsel mentioned during voir dire that he did not have copies of the preliminary instructions read by the trial judge, the judge "screw[ed] up [his] face" (R. 1239); and (4) the trial judge interrupted counsel when he was discussing grand jury indictments and told counsel not to discuss grand juries. During the last interruption, the trial judge "became visibly angry, rose from the bench, threw down his glasses and accused defense counsel of conducting improper voir dire." (R. 1220)

Out of the presence of the prospective jurors, Thakkar moved for a mistrial and moved for the trial judge to recuse himself. The trial judge denied both motions but, after calling the prospective jurors in, did apologize to counsel and explained to the jurors that the judge and attorneys did not always agree on points of law, but that did not mean that anyone had done anything wrong. The judge went on to tell the prospective jurors how much the judge admired Thakkar's counsel.

■ The trial judge has broad discretionary powers to regulate the substance of voir dire and to control the proceedings before him. *Marbley v. State* (1984), Ind., 461 N.E.2d 1102. However, the trial judge also has a duty to remain impartial and refrain from making unnecessary comments or remarks. *Abernathy v. State* (1988), Ind., 524 N.E.2d 12; *see also* Ind. Judicial Conduct Canon 2(A) and Jud. Canon 3(B)(4). In *Abernathy*, our supreme court reversed the trial judge because he failed to adequately maintain neutrality in the case. The trial judge asked questions of witnesses that clearly impeached or discredited the witnesses and indicated the trial judge's opinion of the witnesses' credibility.

We are not faced with the same situation here. The trial judge's conduct in getting visibly angry, pounding papers on the bench and throwing his glasses on the

bench is certainly inappropriate and under a different set of circumstances might taint a jury. However, there is no evidence here that these actions tainted this venire panel to the extent that Thakkar was deprived of a trial before an impartial jury. The other incidences referred to by Thakkar were within the permitted bounds of the trial judge's discretion to regulate the voir dire proceedings and did not prejudice Thakkar.

A review of the entire voir dire proceedings indicates that, although the trial judge's manner was at times inappropriate, Thakkar has not shown that he was denied a trial before an impartial jury as a result of the isolated incidences during the three days of jury selection.

### CUMULATIVE EFFECT

Thakkar also argues that if the trial judge's conduct during voir dire did not alone deprive him of a fair trial before an impartial jury, the judge's conduct coupled with erroneous adverse rulings did. Thakkar points to several adverse rulings: (1) the trial judge made inconsistent rulings in favor of the State based on the separation of witnesses requested by Thakkar, thereby preventing Thakkar from impeaching a State witness while allowing the State to bolster its witness; (2) the trial judge restricted cross-examination of Hertzinger so that Thakkar could not ask about other prior miscarriages or about prior false allegations made by Hertzinger; and (3) the trial judge gave a preliminary instruction on circumstantial evidence.

### *Inconsistent Rulings on Separation of Witnesses*

Prior to trial, the trial judge ordered a separation of witnesses at Thakkar's request. During the direct examination of Dr. Kurtz, the anesthesiologist for Coffey–Myers' tubal ligation, Thakkar's counsel sought to discredit Coffey–Myers' testimony by asking the doctor a question that referred to part of Coffey–Myers' testimony. The State did not make an objection to Thakkar's questioning. However, the trial judge interrupted Thakkar's counsel while he was asking the question and told counsel that the question was improper due to the separation of witnesses order. Thakkar's counsel did not pursue the matter. Upon cross-examination of Dr. Kurtz, the State, over Thakkar's objection, was allowed to bolster Coffey–Myers by asking a question that referred to Coffey–Myers' testimony—precisely what Thakkar was not allowed to do. Thakkar objected on the grounds that if he could not refer to another witness' testimony, neither could the State.

Clearly the trial judge erred in his disparate treatment. The purpose of separation orders is to prevent the testimony of one witness from influencing that of another. *Phillips v. State* (1990), Ind., 550 N.E.2d 1290, *reh'g denied*. That danger was not present here. The trial judge unfairly allowed the State to pursue its questioning after erroneously preventing Thakkar from pursuing his. However, the error was harmless. The discrepancy in Coffey–Myers' testimony and the medical evidence about when the abortion was performed was before the jury—Thakkar was merely prevented from having another witness acknowledge that the medical evidence did not support Coffey–Myers' testimony. Of course, Thakkar does not argue that the trial judge's error here, standing alone, is reversible error. He argues that coupled with the trial judge's conduct discussed above, this error and the other erroneous rulings deprived him of a fair trial. We will discuss the other alleged errors before concluding whether the cumulative effect deprived Thakkar of a fair trial.

### *Restricted Cross–Exam of Hertzinger*

The trial judge properly refused to let Thakkar question Hertzinger about prior false allegations of sexual improprieties she made against another doctor. Evidence of false allegations of *similar* sexual misconduct is admissible on the subject of the victim's credibility so long as the *allegations are demonstrably false. Kelley v. State* (1991), Ind.App., 566 N.E.2d 591, 593. The prior allegations were not similar to the charges of illegal abortion

against Thakkar nor could Thakkar show that the allegations were false.

■ Thakkar was also prevented from cross-examining Hertzinger about her medical history of miscarriages and thus was unable to place before the jury the defense theory that the relevant pregnancy had been terminated by miscarriage rather than by an abortion. Thakkar was also prevented from having an OB/GYN who had treated Hertzinger testify that a woman who has miscarried is more likely to miscarry again. Further, evidence shows that Hertzinger had told people, including the OB/GYN, that she had miscarried the baby Thakkar aborted. The trial judge ruled that evidence of other miscarriages or stillbirths was not relevant.

■ The State makes much of the fact that Thakkar's counsel wanted to question Hertzinger about stillbirths, but that in his offer to prove he asked only about miscarriages, thus waiving any error regarding stillbirths. It is clear from reading the transcript, however, that during the course of the trial the terms were used interchangeably and without distinction. We will not waive a party's assertion of error on mere semantics when it is clear that the parties concerned understood what was meant.

The scope of cross-examination is within the discretion of the trial judge, but the exercise of discretion must be consistent with due process. *McIntyre v. State* (1984), Ind.App., 460 N.E.2d 162, 165–66. Too, the defense is entitled to have its theory presented to the jury. *Id.* The State acknowledged at oral argument that if "miscarriage" and "stillbirth" are used interchangeably, the trial judge erred by not allowing the cross-examination. Thakkar was prevented from presenting the jury with the theory that because Hertzinger had a history of miscarriages and stillbirths prior to and after the Thakkar pregnancy, the Thakkar pregnancy also terminated in a miscarriage or stillbirth. The record also shows she told several people on several occasions that the Thakkar pregnancy terminated in a miscarriage or a stillbirth. The prohibited evidence of other

miscarriages and stillbirths and the evidence that a woman who miscarries once is more likely to miscarry again supported this theory and the jury should have been allowed to consider the proffered evidence. Because we have reversed the conviction concerning an abortion performed on Hertzinger, Thakkar was not prejudiced by the trial judge's error. However, we must consider this error when determining the cumulative effect of the trial judge's conduct and erroneous rulings.

### Preliminary Instruction

■ The final error Thakkar points to is the trial judge's preliminary instruction on circumstantial evidence. Thakkar argues that it was speculation for the trial judge to give the instruction because no evidence had been presented, and that it prejudiced Thakkar by placing undue emphasis on the "considerable amount of circumstantial evidence." (Brief of Appellant, p. 33) Both direct and circumstantial evidence were admitted at trial and Thakkar acknowledges that the instruction "may have been appropriate as a final instruction." *Id.* Thakkar has not shown that giving the instruction as a preliminary one unduly prejudiced him. Further, Ind. Trial Rule 51(A) provides that the trial judge "shall instruct in writing as to the issues for trial, the burden of proof, the credibility of witnesses, *and the manner of weighing the testimony to be received."* (Emphasis added). The trial judge did not err in giving a preliminary instruction on circumstantial evidence.

■ The question is whether the above erroneous, adverse rulings in conjunction with the trial judge's conduct discussed above deprived Thakkar of a fair trial before an impartial jury. After a thorough review of the 3,404–page record, we are satisfied that Thakkar was not denied a fair trial before an impartial jury. The trial judge at no time indicated his belief of one witness over another or led the jury to believe that the State's case was more meritorious than Thakkar's. Further, although the trial judge's conduct was questionable and he did make some erroneous rulings,

we are convinced that those rulings did not impact the jury's verdict. Thakkar is not entitled to a new trial.

## SENTENCING

Thakkar contends that the trial judge erroneously enhanced his sentence for the illegal abortion conviction with respect to Hertzinger by citing as aggravating factors an element of the offense and his lack of remorse. We need not discuss this issue as we are reversing that conviction.

■ However, we *sua sponte* note that the trial judge did not specify aggravating factors to support enhancement of the sentences Thakkar received for the class C felonies with respect to Collins and Coffey–Myers. The trial judge ordered eight-year sentences, although four years were suspended. Thus, the trial judge enhanced each of the presumptive four-year sentences and must specify aggravating factors. *Townsend v. State* (1986), Ind., 498 N.E.2d 1198. We remand with instructions to the trial judge to either re-sentence Thakkar to the presumptive four-year term, or to make a statement of aggravating factors supporting enhancement.

## CONCLUSION

We reverse the conviction for Count VIII, performance of an illegal abortion, a class C felony, affirm each of the other convictions, and remand for either re-sentencing or a statement of aggravating factors.

SHARPNACK, C.J., and RUCKER, J., concur.