986 P.2d 227

**STATE of Arizona, Appellee,**

v.

**Ramon ESCOBAR–MENDEZ aka Ramon Mendez Escobar, Appellant.**

**No. 1 CA–CR 97–0999.**

Court of Appeals of Arizona, Division 1, Department D.

Feb. 25, 1999.

Review Denied Sept. 21, 1999.

---

**4.** Ronquillo's mother, though scheduled to appear, did not attend the defendant's aggrava-   tion/mitigation hearing.

Janet A. Napolitano, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Jack Roberts, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Dean W. Trebesch, Maricopa County Public Defender by Carol A. Carrigan, Deputy Public Defender, Phoenix, Attorneys for Appellant.

## OPINION

GRANT, Judge.

¶ 1 Ramon Escobar–Mendez ("Defendant") appeals his convictions on two counts of sexual conduct with a minor, class 2 felonies. The trial court sentenced him to consecutive,

aggravated terms of fourteen years in prison on each count[1]. For the following reasons, we affirm the convictions and sentences.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In November 1994, Detective Mark Calles ("Detective Calles") was investigating allegations that Defendant had sexually assaulted "S.S.," the minor daughter of Defendant's current girlfriend[2]. During the course of that investigation Detective Calles learned that years earlier Defendant may have also impregnated Y.T., the daughter of a previous girlfriend[3].

¶3 Detective Calles contacted Y.T. in December 1994, and she disclosed for the first time that Defendant had sexually assaulted her on numerous occasions between 1984 and 1987—when she was a minor and he was her mother's live-in boyfriend.

¶4 Y.T. was born on July 6, 1972. She was nine years old when Defendant began dating her mother. He moved in with them about a year later. Defendant began to molest Y.T. shortly thereafter. He told Y.T. to tell her mother that she was having nightmares, and that she wanted to sleep in their bed. Defendant would then have Y.T. come to his side of the bed. He would reach inside her shorts and fondle her vagina without the mother knowing. If Y.T. tried to cross her legs to stop him, he would dig his fingernails into her legs until she relented. One time, when Defendant dug his nails into her, Y.T. screamed and woke her mother up. Her mother asked what was wrong. Y.T. ran crying into the bathroom after telling her mother that she was just having a nightmare. When Y.T. stepped out of the bathroom Defendant was waiting outside the door. He grabbed her by the arm, shook her, and told her he would hurt her the next time she screamed.

¶5 When Y.T. was around twelve years old, Defendant drove her to a secluded area in a river bottom, pulled down her shorts, and had intercourse with her. When Defendant put his penis inside her, Y.T. started to bleed. He told her this was "normal." She cried, and Defendant said, "Don't be such a cry baby." After they got home, Defendant told the mother that Y.T. was bleeding and crying, because she had started to menstruate.

¶6 Y.T. never told her mother, or anyone else, what Defendant did to her because she was afraid of him. Defendant had beaten her mother so badly that she was "all bruised," and he had told Y.T. that he would hurt or even kill her mother, if Y.T. ever disobeyed him. Defendant said that if that happened, it would be Y.T.'s "fault."

¶7 A few weeks later, Defendant again drove Y.T. to the river bottom. He took off her shorts and she started to cry, asking why was he doing this to her. Defendant said he was doing it because he "loved" her. Y.T. tried to resist, but he punched her in the stomach with such force that she lost her breath. Defendant then had sex with Y.T., ejaculating on her leg and scaring her even more. He subsequently told her that he had punched her in the stomach because a blow there would not cause a bruise.

¶8 In February 1986, Y.T.'s mother took her to a doctor because her feet were swollen. The doctor told them that Y.T. was pregnant. Y.T., who had not even suspected she was pregnant, just cried when her mother asked who the father was. When they got home, Defendant told Y.T. to say that the father was a boy from school who had since moved away without even knowing of the pregnancy. This is what Y.T. told her mother. Three days later Y.T. gave birth to a daughter, C.T., at Maricopa Medical Center.

¶9 Defendant again assaulted Y.T. when she was fourteen, this time using a condom,

---

1. The jury deadlocked on additional charges of child molestation, child abuse, sexual conduct with a minor, and aggravated assault. The trial judge declared a mistrial as to those counts.

2. We use initials to protect both victims' privacy.

3. Defendant was indicted on twenty-nine counts of various kinds of sexual abuse involving S.S. However, those counts were severed from the ones involving Y.T., the victim in the present case. The charges stemming from Defendant's alleged assaults on S.S. play no further part in this matter.

because the birth of C.T. had been "a close call." Around the same time, Defendant came into Y.T.'s room and choked her because he had seen her in the company of a teenage boy.

¶ 10 Y.T. never told anyone that Defendant was the father of her child, even after he had moved out of the house, because she was afraid of him. When Detective Calles contacted her in December of 1994, Y.T. told someone for the first time what Defendant had done to her. DNA analysis showed a 99.7% probability that Defendant was C.T.'s father. The grand jury indicted Defendant on October 11, 1995.

¶ 11 The jury convicted Defendant of two counts of sexual conduct with a minor, and the court sentenced him to consecutive fourteen year prison terms on both counts. Defendant timely appealed. This court has jurisdiction to adjudicate the appeal. Ariz. Const. art. VI, § 9; Arizona Revised Statutes Annotated ("A.R.S.") sections 12–120.21(A)(1), and 13–4033(A)(1).

¶ 12 On appeal Defendant argues that the State is barred from prosecuting him by the seven year statute of limitations in A.R.S. section 13–107.

## DISCUSSION

A. *Because the State exercised reasonable diligence in discovering Defendant's crimes and because the delay in indicting him was due to Defendant's efforts to conceal his crimes, the statute of limitations does not bar prosecution.*

██ ¶ 13 Statutes of limitations in criminal cases are jurisdictional. They limit the power of the sovereign to act against the accused. *Price v. Maxwell,* 140 Ariz. 232, 234, 681 P.2d 384, 386 (1984). Moreover, statutes of limitations are construed liberally in favor of the accused and against the prosecution. *State v. Fogel,* 16 Ariz.App. 246, 248,

492 P.2d 742, 744 (1972). However, the Arizona criminal statutes of limitations are explicit. Unlike most statutes of limitations, they do not begin to run until the State, or the political subdivision of the State having jurisdiction, actually discovers or should have discovered that the offense occurred[4]. The applicable limitations statute reads as follows:

> Except as otherwise provided in this section, prosecutions ... must be commenced within the following periods *after actual discovery by the state or the political subdivision having jurisdiction* of the offense or discovery by the state or such political subdivision *which should have occurred with the exercise of reasonable diligence,* whichever first occurs:
>
> 1. For a class 2 ... felony, seven years.

A.R.S. § 13–107(B) (emphasis added).

¶ 14 In the present case, Defendant does not dispute that police actually "discovered" the offenses charged when Detective Calles first interviewed Y.T. in December, 1994. Because Defendant was indicted ten months later, the seven year statute of limitations is easily satisfied *unless* the State or the political subdivision *having jurisdiction over the offense* did not act with reasonable diligence in discovering it.

██ ¶ 15 We review the trial court's decision concerning whether the State proceeded with reasonable diligence for an abuse of discretion. We will not disturb its ruling if it is supported by any reasonable evidence. *Humble v. Superior Court,* 179 Ariz. 409, 414, 880 P.2d 629, 634 (App.1993); *State v. Armstrong,* 160 Ariz. 159, 161, 771 P.2d 889, 891 (App.1989).

██ ¶ 16 Defendant argues that when thirteen-year-old Y.T. had a baby at a county hospital this amounted to "actual discovery" by a political subdivision of the State or "discovery which should have occurred with

---

4. After correctly citing A.R.S. section 13–107, Defendant unaccountably argues that the statute begins to "run" when the offense is completed, not when it is discovered by the State, he cites *State v. Barber,* 133 Ariz. 572, 653 P.2d 29 (App. 1982), *approved,* 133 Ariz. 549, 653 P.2d 6 (1982). However, *Barber* construed former A.R.S. section 13–106(B) (repealed in 1978), which explicitly stated that prosecution had to commence within five years after the *commission of the offense. Id.* at 574, 653 P.2d at 31. This statute was similar to those in most other jurisdictions in that it started to run when the offense was committed, not when it was discovered. *See Model Penal Code,* American Law Institute (1985), art. 1, § 1.06(2)(a) and (3).

reasonable diligence."[5] However, we do not believe a county hospital qualifies as a political subdivision of the State for purposes of this statute of limitations. A political subdivision of the State typically has the following attributes: (1) it exists for the purpose of discharging some function of local government, (2) it has a prescribed geographic area, and (3) it possesses authority for subordinate self-government by officers selected by it. *McClanahan v. Cochise College*, 25 Ariz.App. 13, 16–17, 540 P.2d 744, 747–48 (1975) (citing *Sorenson v. Superior Court*, 31 Ariz. 421, 425, 254 P. 230, 231 (1927)) (holding that a community college district is a political subdivision of state). While a county hospital may arguably perform some functions of local government, may be part of a hospital district, and may have the authority of self-governance through a board of directors, nothing in the record suggests that the Maricopa county hospital is such an entity. *See* A.R.S. §§ 48–1901 through –1916. Moreover, even if a county hospital is a political subdivision, it clearly would not have jurisdiction over the offense of sexual conduct with a minor as required by A.R.S. section 13–107.

■ ¶ 17 While Defendant does not refine his argument to this extent, we have considered whether A.R.S. section 13–3620, which requires physicians and others to report the suspected molestation of children under the age of fourteen, makes every such person an agent of the State for the purposes of A.R.S. section 13–107(B). In other words, is the knowledge of such persons imputed to the State? We think it is not. The only case that might support such an argument is from a jurisdiction where the statute of limitations expressly runs from the time that a person required by statute to report suspicious conduct received information that a crime occurred. *See State v. Ritchie*, 95 Ohio App.3d 569, 642 N.E.2d 1168, 1169 (1994).

■ ¶ 18 While the question of reasonable diligence turns on the details of each case, the general standard is whether the State took reasonable steps to pursue the matter, or failed to follow-up on significant leads. *See Snow v. Superior Court*, 183 Ariz. 320, 325, 903 P.2d 628, 633 (App.1995) (in Rule 8 context State's failure to contact nearest relative who had been listed by defendant showed lack of diligence in locating him); *Humble*, 179 Ariz. at 414, 880 P.2d at 634 (failure to follow-up on any of four significant leads shows lack of diligence); *Armstrong*, 160 Ariz. at 161, 771 P.2d at 891 (no effort to check MVD records or speak with neighbor or telephone defendant shows lack of diligence).

■ ¶ 19 In determining whether the State acted with reasonable diligence in discovering Defendant's offenses, we must consider Defendant's attempts to conceal them[6]. Some jurisdictions with statutes of limitations that run from the date of the offense also have provisions explicitly tolling the statute if the defendant takes *positive steps* to conceal the fact that a crime was committed. *See* Nevada Revised Statutes Annotated § 171.095(1)(a); Ohio Revised Code Annotated §§ 2901.13(F) and (G); Kansas Statutes Annotated § 21–3106(6)(c); Tennessee Code Annotated § 40–2–103.

¶ 20 Some courts have even held that statutes of limitations are tolled in child molestation cases when threats by the adult perpetrator coerce the child into remaining silent. *Crider v. State*, 531 N.E.2d 1151, 1154 (Ind. 1988) (threat to put daughters "in the hospital" if they ever report molestation tolls five-year statute); *State v. Danielski*, 348 N.W.2d 352, 357 (Minn.App.1984) (where same parental authority used to perpetrate sex acts

5. In 1986, as today, physicians had a legal duty to report suspected cases of child molestation if their examination gave them reasonable grounds to believe it had occurred. Failure to do so could (and still can) result in criminal prosecution. *See* A.R.S. § 13–3620.

6. We note that A.R.S. section 13–107(E) has recently been amended so that the limitation period does not begin to run if the identity of the person who commits a "serious offense" pursuant to A.R.S. section 13–604 is unknown. Sexual conduct with a minor is such an offense. However, this revision does not apply to the present case because statutes of limitations only apply to offenses committed after their adoption. *Martin v. Superior Court*, 135 Ariz. 99, 100, 659 P.2d 652, 653 (1983).

against child also used to prevent child from reporting statute is tolled); *State v. French,* 392 N.W.2d 596, 599 (Minn.App.1986); *Thakkar v. State,* 613 N.E.2d 453, 457–58 (Ind. App.1993) (suggesting coercion of adult sexual assault victim might toll statute). *But see State v. Bentley,* 239 Kan. 334, 721 P.2d 227 (1986) (threats made to a child do not constitute concealment of a crime).

¶ 21 In the present case, Defendant not only physically abused both Y.T. and her mother, he explicitly threatened to kill the mother if Y.T. ever disobeyed him. Y.T. testified that she never told anyone about Defendant's repeated assaults because she was scared of him. Moreover, Defendant had Y.T. tell her mother the one version of how she got pregnant that would not necessarily involve a crime. He told Y.T. to say that a young boy from school had impregnated her, and had then moved away. *See* former A.R.S. section 13–501 (person under fourteen not criminally responsible absent clear proof person knew conduct was wrong). The record does not indicate what Y.T. told medical personnel at. the county hospital. These were "positive" acts by Defendant intended to conceal his crimes. At the time Y.T. gave birth Defendant had intimidated her into lying about how she had gotten pregnant and there would have been no significant leads for the State to pursue.

 ¶ 22 Detective Calles appears to have acted with much more than just reasonable diligence in uncovering Defendant's crimes. While investigating a seemingly unrelated case he received a tip that Y.T. also might have been a victim. Detective Calles located Y.T., and interviewed her, less than a month after receiving that tip. The grand jury indicted Defendant ten months later. In other words, as soon as one significant lead came to the State's attention the matter was vigorously investigated, and prosecution expeditiously commenced.

¶ 23 Defendant's physical assaults, and his threats against Y.T., and against her mother, coerced Y.T. into not coming forward. A lack of diligence by the State did not cause the delay in prosecution. The coercive acts by Defendant and the story he made up about the young boy who had moved away

caused the delay in the discovery and prosecution of his crimes.

### CONCLUSION

¶ 24 For the foregoing reasons, we affirm Defendant's convictions and sentences. We have not reviewed the record for fundamental error. *State v. Smith,* 184 Ariz. 456, 910 P.2d 1 (1996).

CONCURRING: SHELDON H. WEISBERG, Presiding Judge, and THOMAS C. KLEINSCHMIDT, Judge.